EMBRY, Justice.
This is an appeal from a judgment notwithstanding the verdict. Plaintiffs Robert E. Morgan (Morgan), Edwin M. Speed (Speed), and their professional association (the “Association”) sued South Central Bell (Bell) and L.M. Berry & Company (Berry) to recover damages they claim were incurred as a result of the omission of Morgan’s name from the Yellow Pages of the 1978 and 1979 Birmingham telephone directories and the 1980 Bessemer directory. After a jury verdict in the amount of $57,-000 in favor of plaintiffs, the trial court granted defendants’ motion for judgment non obstante veredicto, and awarded the plaintiffs nominal damages of $25. Before addressing the issues, we will review the facts from which this dispute evolved.
FACTS
Speed and Morgan are periodontists, dentists who are trained to treat gum disease. Drs. Speed and Morgan both taught at the University of Alabama Dental School until their retirement, when they decided to form a professional association for private practice.
1978
Speed and Morgan divided the responsibilities for setting up their office. Speed arranged for telephone service. He spoke with a person at Bell on several different occasions to find out how both he and Morgan could be placed in the Yellow Pages with a telephone number and address for an office not yet completed. He found out that, in order to obtain a listing for them in the Yellow Pages, they would have to have a telephone installed on a pole outside the uncompleted office building. The order for service was then placed by Speed.
Speed contends that he stressed to Bell, when he requested service, the importance to the association of having both his and Morgan’s name placed in the Yellow Pages for advertisement. At the time Morgan and Speed opened their offices, the only permanent form of advertising permitted by the State Board of Dental Examiners was a listing in the Yellow Pages.
In August of 1978, when the 1978 Birmingham telephone directory was delivered, Morgan and Speed discovered that Speed’s name was listed properly in both the Yellow and White Pages, and that Morgan’s name was listed in the White Pages, but not in the Yellow Pages.
Morgan telephoned Bell, received apologies for the omission, but was told that nothing could be done for him. He was told to contact Bell at a later time for corrections. During the conversation, it was confirmed that Bell had the correct information for the desired listing of both Speed and Morgan.
Several months later, because of errors in the Yellow Pages resulting from conversion to the use of computers, a supplementary directory for 1978 was distributed by South Central Bell. Morgan’s name did not appear in that directory either. It was Bell’s position at trial that the supplementary directory was issued for the purpose of correcting the errors in the earlier 1978 directory and not for the purpose of making any additions or deletions as a result of information obtained after the publication *111 of the first Yellow Pages directory. However, the plaintiffs contend Bell had made a mistake in their 1978 listings and that the mistake should have been corrected by the supplement.
After the supplementary directory was issued, Morgan again telephoned Bell and again received apologies, plus another confirmation that Bell had had the correct information all along. At that time, however, Morgan was told there might be a problem with Berry, a company under contract with Bell to sell advertisements for the Yellow Pages. Morgan then called Berry and was told that work had not yet begun on the 1979 directory. He was told to contact Berry after the new year.
1979
After the first of the year (1979), Morgan contacted Berry and explained his problem again. In that conversation with Berry, Morgan asked if there was anything further he needed to do in order to get his name in the Yellow Pages. Berry told him there was nothing further for him to do.
Several weeks later, Morgan received a telephone call from Berry inquiring if any further changes were desired in the Yellow Pages listing. Morgan’s secretary relayed the message to him, and Morgan replied, through his secretary, there were no further changes. He claims he assumed, because of his prior conversation with Berry, that they had the correct information.
When the 1979 directory was delivered, Morgan and Speed discovered Morgan’s name had once again been left out of the Yellow Pages. Morgan immediately telephoned Bell and confirmed again that Bell had the correct information and Bell could offer no explanation for the omission. Bell said once again it could be the fault of Berry.
Morgan then went to Berry’s office, where he was told Berry had no record regarding the matter.
On 27 December 1979, the complaint in this case was filed by Speed and Morgan.
1980
After this law suit was filed, a Berry sales representative came to the office of Speed and Morgan and prepared a contract for the purpose of listing them both in the 1980 Yellow Pages. Both Speed’s name and Morgan’s name were then correctly included in the 1980 Birmingham Yellow Pages.
Meanwhile, however, Morgan and Speed had opened an office in Bessemer. Chris Allen, a representative of Bell, came by the Centerpoint office to talk with Morgan about the Association’s Bessemer needs. Allen assured Morgan at the conclusion of their talk, after having been informed of the pending lawsuit, that Morgan’s name would appear in the Bessemer Yellow Pages. When the Bessemer directory was published, Morgan’s name was, for the fourth time, correctly listed in the White Pages, but omitted from the Yellow Pages.
It was undisputed at trial that, under South Central Bell policy, the only way Morgan’s name could get into the Yellow Pages is by way of a contract with Berry. As explained by Lucy Brasher, a manager with South Central Bell, when a subscriber orders telephone service, he is entitled to a free listing in both the Yellow and White Pages. Any further listing in either the White or Yellow Pages is referred to as an “additional listing.” To obtain an additional listing in the White Pages, the subscriber deals with South Central Bell. That is why Morgan’s name consistently appeared in the White Pages. To obtain an additional listing in the Yellow Pages, a subscriber must deal with Berry, which, pursuant to its contract with Bell, solicits listings in the . Yellow Pages, and sends orders for additional listings to Bell. Plaintiffs contend they were never, until trial, made aware of this arrangement by agents of Bell or Berry.
To summarize the above facts, Dr. Speed’s name was at all times listed in the Yellow and White Pages of the telephone directory just as he wished. Dr. Morgan’s name was at all times listed in the White Pages, but was omitted from the 1978 Bir *112 mingham Yellow Pages, the 1978 supplementary Yellow Pages, the 1979 Birmingham Yellow Pages, and the 1980 Bessemer Yellow Pages.
STATEMENT OF THE CASE
Before addressing the issues presented on appeal, it is crucial to the reader’s understanding of those issues to examine the plaintiffs’ complaint and several trial court rulings which set the stage for this appeal.
Concerning the 1978 and 1979 Birmingham directories, the plaintiffs alleged fraud, negligence, and breach of contract. Relative to the 1980 Bessemer directory, the plaintiffs alleged fraud against Berry and breach of contract against both Bell and Berry.
The trial court granted motions for a directed verdict filed by each of the defendants on the fraud and negligence counts as they related to the 1978 Birmingham telephone directory because those claims were barred by the one-year statute of limitations. The court also granted Berry’s motion for directed verdict on the breach of contract count as it related to the 1978 directory and the fraud count as it related to the 1980 directory.
Even though the court had eliminated the negligence claim arising from the 1978 Birmingham directory, and despite the fact that there had never been a negligence claim, or a fraud claim in connection with the 1980 Bessemer telephone directory against Bell, the trial court instructed the jury to consider such charges in the form of a special interrogatory. Those special interrogatories which were submitted to the jury, and the jury’s responses, are set forth below:
1.With respect to the claim asserted by Robert E. Morgan and Edwin M. Speed, P.A., a professional association, for damages resulting from breach of contract or negligence with respect to the publication of the 1978 Yellow Pages and the 1980 Bessemer Yellow Pages, is Bell liable?
Jury response: Yes, in the amount of $18,000.
2. With respect to the claim asserted by Robert E. Morgan for mental anguish and emotional disturbance resulting from breach of contract with respect to the publication of the 1978 Yellow Pages and the Bessemer 1980 Yellow Pages, is Bell liable?
Jury response: Yes,.in the amount of $5,000.
3. With respect to the claim asserted by Robert E. Morgan and Edwin M. Speed, P.A., a professional association, for damages resulting from breach of contract, negligence, and fraud with respect to the publication of the 1979 Yellow Pages, is Bell liable? Is Berry liable?
Jury response: Both are liable, and in the amount of $24,000.
4. With respect to the claim asserted by Morgan for mental anguish and emotional disturbance resulting from breach of contract, negligence and fraud with respect to the publication of the 1979 Yellow Pages, is Bell liable, and is Berry liable?
Jury response: Both are liable, and in the amount of $5,000.
5. With respect to the claim of plaintiffs for punitive damages based on fraud or wanton conduct with respect to the publication of the 1979 Yellow Pages, is Bell liable, and is Berry liable?
Jury response: Both are liable, and in the amount of $5,000.
Defendants did not specifically object to the inclusion of counts for which directed verdicts had been granted.
Both defendants filed post-trial motions for judgment notwithstanding the verdict, or, in the alternative, for a new trial. The trial court entered an opinion and order *113 granting judgment notwithstanding the verdict. It did not rule on the alternative new trial motions. The trial court left the jury’s verdict for the plaintiff intact but, as previously stated, remitted damages to nominal damages in the amount of $25.
Plaintiffs appeal, asking this court to reinstate the original judgment, or suggest a remittitur of the original judgment, giving them the option of accepting a reduced judgment or taking a new trial.
STANDARD OF REVIEW ON APPEAL
A motion for judgment notwithstanding the verdict tests the sufficiency of the evidence in the same way as a motion for directed verdict at the close of all the evidence. Granting the motion for judgment notwithstanding the verdicts says, without weighing the credibility of the evidence, there can be but one reasonable conclusion from the evidence as to the prior judgment. Warren v. Ousley, 440 So.2d 1034 (Ala.1983).
In reviewing the trial court’s allowance of judgment notwithstanding the verdict, the test we apply, is whether, under the scintilla rule, the evidence, when it is viewed in the light most favorable to the plaintiffs, supports their case. Rule 50(e), ARCP; Harville v. Goza, 393 So.2d 988 (Ala.1981).
ISSUES
Plaintiff’s brief lists twelve issues for our consideration. After carefully reviewing the briefs and the record, we are of the opinion that these twelve issues are embraced in the following:
1. Whether the trial court erred in holding there was insufficient evidence offered to prove fraud.
2. Whether the trial court erred in holding there was insufficient evidence offered to prove negligence.
3. Whether the trial court erred in determining appellants’ offer of proof of lost profits was too speculative and uncertain and, therefore, insufficient to support recovery of compensatory damages.
4.Whether the trial court erred in the application of an exculpatory clause contained in the 1980 contract to determine there was sufficient evidence to support the jury’s verdict as to that contract.
The trial court, in its final order, addressed each of the issues raised on appeal. That court’s conclusions will be set forth below in the discussion of each issue.
I
First, we consider whether there was sufficient evidence for submission of a fraud count to the jury and to support the jury’s award of punitive damages.
Speed and Morgan allege, in their claim based on fraud, that Bell and Berry failed to inform them a written contract was needed in order to be included in the yellow pages. There was evidence at trial that a written contract with Berry was needed. They further allege that Morgan was repeatedly told he needed to take no further action in order to be properly listed when, in fact, further action was needed.
Appellees argue the evidence did not support a finding they were guilty of fraud nor was the evidence sufficient for an imposition of punitive damages authorized by Code 1975, § 6-5-101. That section states:
“Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.”
Here, we are concerned with “[mjisrepre-sentations ... made ... without knowledge.” A false representation, even if made by mistake or innocently, is a legal fraud, and this section applies, entitling a plaintiff to compensatory damages. However, punitive damages may not be recovered in such an action unless the fraud is gross, malicious, oppressive and is made with knowledge of its falseness, or so recklessly made as to amount to the same thing *114 and is made with the purpose of injuring the plaintiff. Gulf Shores, LTD. v. Powrzanos, 442 So.2d 71 (Ala.1983); Randell v. Banzhoff, 375 So.2d 445 (Ala.1979), cert. denied 444 U.S. 1081, 100 S.Ct. 1034, 62 L.Ed.2d 765 (1980)
An award of punitive damages is largely discretionary with the factfinder, in this case, the jury. Winn-Dixie Montgomery, Inc. v. Henderson, 353 So.2d 1380 (Ala.1977). Applying the rule of law to the facts here, however, we find that, while the evidence supports a finding that defendants were guilty of fraud, the evidence is insufficient for an imposition of punitive damages.
The plaintiffs offered no proof that anyone from either Bell or Berry possessed the requisite intent to deceive or injure them. In fact, Morgan testified he never thought anyone from Bell or Berry intentionally lied to him or was trying to “do him in.”
II
The trial court also held that an action for negligence was not supported by the facts. That court improperly characterized defendants’ negligence in their performance of contracts entered into with the plaintiffs as nonfeasance rather than misfeasance. There is, in Alabama, no tort liability for nonfeasance for failing to do what one has promised to do in the absence of a duty to act apart from the promise made. On the other hand, misfeasance, or negligent affirmative conduct in the performance of a promise generally subjects an actor to tort liability as well as contract liability for physical harm to persons and tangible things. See C & C Products, Inc. v. Premier Industrial Corp., 290 Ala. 179, 186, 275 So.2d 124 (1972); and Garig v. East End Memorial Hospital, 279 Ala. 118, 182 So.2d 852 (1966).
This distinction arises from the general rule of tort law to the effect that one who acts is under a duty to exercise reasonable care to avoid physical harm to persons and to property of others and this general duty or obligation would extend to parties in bargaining transactions such as sales and service transactions as well as to those who are not parties to bargaining transactions. Entering into a bargaining transaction, pursuant to which one party promises to do something, does not alter the fact that there was a preexisting obligation to act with reasonable care to avoid harm. Prosser, Selected Topics in the Law of Torts, 655, at 655-667 (1984).
The rule which seems to have emerged from the decisions in the United States is that there will be liability in tort whenever misperformance involves a foreseeable, unreasonable risk of harm to the interests of the plaintiff or where there would be liability for performance without the contract. More simply stated, we must determine whether there is a legal duty sufficient to support an action for negligence. For that determination, three primary considerations are important: (1) the nature of the defendant’s activity; (2) the relationship between the parties; and (3) the type of injury or harm threatened. Id., p. 655.
The relationship between plaintiffs and defendants was primarily a contractual one. However, under the circumstances of the contract entered into — where plaintiffs were clearly dependent on the Yellow Pages as their only form of advertisement, defendants were aware of that dependency, and, though undertaking to perform the contract, did so in such a negligent and slipslod manner that plaintiff Morgan’s name was omitted from the Yellow Pages four times in succession — there is clearly tort liability. Furthermore, the type injury and harm threatened, and finally, actually incurred, was such that the imposition of tort liability is here appropriate.
III
Next we consider whether there was sufficient evidence to support the jury’s award of compensatory damages for lost profits. In support of that award, Morgan and Speed offered two forms of evidence. First, they offered testimony by a former patient of Morgan’s that he searched for *115 Morgan’s name in the phone book and would have used his services had he been able to locate Morgan.
Second, they offered testimony by Morgan and by a statistician at the University of Alabama in Birmingham concerning a statistical survey conducted by the plaintiffs to prove that lost profits during their first year in operation were due to the omission of Morgan’s name from the Yellow Pages directory. They also attempted, from that survey, to forecast the amount of time which would be necessary for the Association to recoup losses due to the omission.
Morgan actually conducted the survey, which was a simple sampling during three separate periods of a week each, the purpose of which was to make a “yardstick comparison” of the number of patients the Association received as a result of Speed’s advertisement in the Yellow Pages to the number of patients Morgan received as a result of such advertisement (zero).
The trial court excluded testimony concerning the survey and plaintiffs presented that testimony, for the record, outside the presence of the jury. Morgan presented ample testimony concerning his credentials as an experienced statistical researcher, and then proceeded to describe his survey. During the three separate weeks, he questioned each patient that came into the Association’s offices as a patient for full mouth surgery. He determined that, during the first week, of five new surgical patients, one arrived solely as a result of the Yellow Page advertisement. During the second week, out of six new patients, two arrived solely as a result of the Yellow Page advertisement. During the third week, out of seven new patients, two came in as a result of the Yellow Page advertisement.
After having arrived at a figure of 1.6 patients per week for 48 weeks, and multiplying by the $700 normal fee for full mouth surgery, the total loss for 1978 came to $53,760.
Also out of the presence of the jury, Dr. Alfred Bartolucci gave testimony about Morgan’s statistics. He is the chairman of the Department of Bio-Statistics and Bio-Mathematics at the University of Alabama in Birmingham. His status as an expert in statistical research was established and went unchallenged.
Dr. Bartolucci examined and made computations on Morgan’s surveys. It was his opinion that Morgan had made a reliable survey in that it was not “time dependant” (it was conducted over different seasons), and that the sample of people surveyed was large enough so that the inferences could be projected onto the total number of patients the Association would have had for the year. Dr. Bartolucci stated that, in his opinion, Morgan’s data were reasonable and the projections derived from the data were reasonable.
The trial court sustained defendants’ objections to the evidence and excluded it from trial. It was that court’s opinion that the plaintiffs’ evidence as to lost profits was overly speculative. Despite the trial court’s ruling, and without objection from defendants, counsel for Morgan questioned him before the jury to determine whether he had a judgment as to the percentage of patients who came to his office as a result of the Yellow Page alone. He answered, “One point six per week.” Morgan further testified that the average charge in effect at the time for full mouth surgery was $700 per patient.
The rule in Alabama concerning proof of lost profits was set forth in Paris v. Buckner Feed Mill, Inc., 279 Ala. 148, 149, 182 So.2d 880, 881 (1966), by Justice Simpson:
“... In order that it may be a recoverable element of damages, the loss of profits must be the natural and proximate, or direct, result of the breach complained of and they must also be capable of ascertainment with reasonable, or sufficient, certainty, or there must be some basis on which a reasonable estimate of the amount of the profit can be made; absolute certainty is not called for or required." (Emphasis added.)
*116 This general rule is applied in most states, and is referred to as the rule of “reasonable certainty.” The United States Supreme Court, in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), stated that this rule precludes only those damages not resulting from the wrong, allowing damages stemming from the wrong but uncertain in amount.
In essence, the rule dictates that recovery will ensue despite the fact damages cannot be calculated with mathematical certainty or without difficulty where they are clearly proximately caused by the wrong. The Fifth Circuit Court of Appeals once remarked, “Contracts do not evanesce because of the perplexities in their construction, and their consequences cannot be ignored because of vexations in damage ascertainment.” Fujimoto v. Rio Grande Pickle Co., 414 F.2d 648, 656 (5th Cir.1969). More simply stated, the rule dictates recovery will ensue despite the fact damages cannot be calculated with mathematical certainty. To disallow damages unless absolutely certain would encourage breach of contract with new businesses and with those whose profits fluctuate.
We think, after having reviewed the evidence of lost profits submitted by the plaintiffs, that they supplied evidence providing a reasonable basis for the jury to approximate the damages sustained and to support their theory of proximate cause. They presented expert testimony as to losses which were calculated by a rational means. Their measure of losses involved a commonly acceptable practice of making a horizontal comparison of two businesses. In this case, it involves a comparison between two professionals in the same business, Morgan and Speed. This approach gauged Morgan’s expectancy interest relative to profits directly resulting from his advertising in the Yellow Pages. The reliability of this approach is increased by the similarity of the circumstances Speed and Morgan entertained.
While the survey prepared by Morgan and Speed did not allow for exact computations, it did provide a basis from which the jury could, with reasonable certainty, calculate the amount of profits which were lost as a result of defendants’ failure to list Morgan’s name in the Yellow Pages.
Y
Next, we consider whether defendants could properly, by virtue of an exculpatory clause, limit their liability for negligence or breach of the 1980 contract for services to the Association’s office in Bessemer.
The first page of the 1978 and 1979 Yellow Pages contains the following statement:
“The Telephone company assumes no responsibility or liability for errors or omissions occurring in the yellow pages. Errors or omissions will be corrected in a subsequent issue, if reported by letter to the company.”
No evidence was presented in the trial of this case that the plaintiffs knew or were on notice of such limitation with respect to the 1978 and 1979 Birmingham Yellow Pages.
Relative to the 1980 Bessemer Yellow Pages, however, an advertising order signed by Morgan states that the listing is subject to the terms and conditions set forth on the reverse side of that document. The reverse side of the order states under paragraph 7 as follows:
“The liability of the Telephone Company, or of any person or firm soliciting advertising for it, on account of errors in or omissions of the advertising described on the reverse side, or advertising changes or deletions subsequently ordered by the applicant by telephone or otherwise, shall in no event exceed the amount of charges for the advertising which was omitted or in which the error occurred in the then current directory issue, and such liability shall be discharged by an abatement of the charges for the particular listing or advertisement in which the omission or error occurred.”
*117 The trial court held that exculpatory clause in the 1980 contract valid and enforceable. Plaintiffs contend the clause was not freely bargained for, is unconscionable in nature, and should not be enforced by this court.
We recently considered the issue of exculpatory clauses relative to the residential leases in Lloyd v. Service Corp. of Alabama, 453 So.2d 735 (Ala.1984). There we held that we would refuse to enforce exculpatory clauses in residential leases where not clearly bargained for and where the parties to the contract are not in an equal bargaining position. The burden of proof was placed on the party attempting to enforce the exculpatory clause.
The instant case illustrates the need for a more comprehensive rule concerning exculpatory clauses. A review of the various methods by which other states have dealt with exculpatory clauses and their refusal to enforce them convinces us that the best rule, and the simplest in application, is that exculpatory clauses affecting the public interest are invalid. That rule was set forth by the California Supreme Court in Tunkl v. Regents of the University of California, 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441 (1963). Six criteria were established to identify the kind of agreement in which an exculpatory clause is invalid as contrary to public policy.
“... [1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some member of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract or exculpation, and makes no provision whereby a purchaser may pay additional fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.” (60 Cal.2d at 98-101, 32 Cal.Rptr. at 37-38, 383 P.2d at 445-446.) (Footnotes omitted.)
The transaction before this court clearly meets the Tunkl criteria. The contract arises out of a private business transaction of the telephone company which in all other respects is regulated by the Public Service Commission in performing its services. Certainly, the telephone company would not argue that it is engaged in a business other than one which performs a service of great importance to the public when it distributes a Yellow Pages book without cost to every telephone customer. The telephone company without question holds itself out as willing to give reasonable public service to all who apply for an advertisement in the Yellow Pages.
As to whether the telephone company, which is invoking exculpation, possesses a decisive advantage of bargaining strength, the courts have differed. Some courts hold that there are many other modes of advertising which the businessman may employ if the contract offered him by the telephone company is not attractive. Wille v. Southwestern Bell Telephone Co., 219 Kan. 755, 549 P.2d 903, 910 (1976).
The issue, however, is not whether there are other forms of advertising available, but whether such other modes are tied directly to the telephone service enjoyed by almost every home and business in the state. The telephone company has an exclusive private advertising business which is tied to its public utility service of providing telephone service and which reaches almost every home and office in the state. Therefore, the telephone company can state to a customer that an ad will be published *118 but name its own terms, including a limitation of its own liability for negligence.
We are satisfied that the plaintiffs did not have a meaningful choice relative to the inclusion of an exculpatory clause in the 1980 Bessemer contract and that the defendants had the bargaining power in a gross and unbalanced manner in determining the terms and conditions in the directory advertisement.
Therefore, the exculpatory clause is unenforceable because, under the criteria above established, it is invalid as contrary to public policy.
For the above stated reasons, we reverse the trial court’s judgment and remand the cause to that court for new trial.
REVERSED AND REMANDED.
TORBERT, C.J., and MADDOX, FAULKNER, JONES, ALMON, BEATTY and ADAMS, JJ., concur.
SHORES, J., recused.