868 So.2d 429 (2003)
MORRIS CONCRETE, INC.
v.
Jessie WARRICK d/b/a Speed Tech Automotive, and Bennie Childress.
2011265.
Court of Civil Appeals of Alabama.
May 23, 2003.
Opinion on Return from Remand July 25, 2003.
*432 Carroll H. Sullivan and Benjamin C. Heinz of Clark, Scott & Sullivan, P.C., Mobile, for appellant.
Michael A. Dasinger III of Hoiles, Dasinger & Hollon, P.C., Robertsdale, for appellee Jessie Warrick.
C. Andrew Harrell, Jr., of Herbert & Harrell, LLC, Gulf Shores, for appellee Bennie Childress.
CRAWLEY, Judge.
Morris Concrete, Inc., appeals from the trial court's judgment in favor of Jessie Warrick d/b/a Speed Tech Automotive, and Bennie Childress. We affirm in part, reverse in part, and remand.
Childress, who was at the time an employee of Morris Concrete, purchased concrete from Morris Concrete at an employee-discounted rate and supplied it to Warrick in exchange for Warrick's waiving a down payment on a pickup truck that he was selling to Childress. Warrick used the concrete as a foundation slab for a metal building, attached to his existing business, that he intended to use as a tire service shop. When Childress ordered the concrete, he specified that it needed to be capable of withstanding 3,000 pounds of pressure per square inch ("PSI"), which was required for the automobile lifts Warrick was going to have installed. After being informed by a representative of the automobile-lift company that there might be a problem with the quality of the concrete, Warrick contacted Morris Concrete. Morris Concrete subsequently employed an engineering company to test the concrete. The testing results indicated that the concrete's tolerance was well below 3,000 PSI.
Warrick sued Childress and Morris Concrete alleging that he was a third-party beneficiary of the contract of sale between them and seeking damages on counts of breach of contract, breach of express warranty, breach of implied warranties of fitness for a particular purpose and merchantability, and fraud. Childress filed an answer and an amended answer to Warrick's complaint; he also filed a cross-claim against Morris Concrete, seeking to be indemnified for any amount that the trial court awarded against him to Warrick. Morris Concrete filed an answer to Warrick's complaint; it also filed a cross-claim against Childress, seeking to be indemnified by him to the extent that the trial court found against it and in favor of Warrick.
Morris Concrete filed a motion requesting the trial court to allow it to enter onto Warrick's property to test the concrete; that motion was initially granted by the trial court. However, upon receiving a motion to reconsider that ruling by Warrick and a response thereto by Morris Concrete, the trial court conducted a hearing and set aside its previous ruling, thus preventing Morris Concrete from testing the concrete for a second time. After conducting a bench trial on the parties' claims, the trial court entered a judgment that stated:

*433 "This cause having come before this Court for a final hearing on June 25, 2002[,] and the parties being present, with counsel, and the Court, on the evidence presented, finds in favor of [Warrick] and against [Childress] on breach of contract, in favor of [Warrick] and against [Morris Concrete] on breach of contract as [Warrick] being a third[-]party beneficiary, and in favor of [Warrick] and against [Morris Concrete] on breach of implied warranty and negligence and awards compensatory damages in the amount of $75,000.00, plus costs of court.
"The Court finds in favor of [Morris Concrete and Childress] and against [Warrick] on fraud and express warranty claims.
"On the cross[-]claim by Childress against Morris [Concrete] the Court finds in favor of Childress and awards damages in the amount of $75,000.00.
"On the cross[-]claim by Morris [Concrete] against Childress the Court finds in favor of Childress."
Morris Concrete filed a motion for a new trial or for the trial court to alter, amend, or vacate the judgment. The trial court denied that motion. Morris Concrete filed a notice of appeal to the supreme court. This case was transferred to this court by the supreme court, pursuant to § 12-2-7(6), Ala.Code 1975.
On appeal, Morris Concrete argues that the trial court erred by entering judgment in favor of Warrick and Childress because, it says, (1) Warrick was not a third-party beneficiary to a contract between it and Childress; (2) it did not breach the implied warranties of merchantability and fitness for a particular purpose; (3) Warrick provided no evidence to support an allegation of negligence[1]; (4) the amount of damages awarded were excessive; (5) Childress was not entitled to damages in the amount of $75,000 on his cross-claim; (6) the trial court erred by not allowing it to enter onto Warrick's property to test the concrete; and (7) the trial court erred by denying its motion for a new trial without conducting a hearing on the motion.
The trial court conducted a bench trial on the parties' claims. Our review is therefore governed by the ore tenus standard of review.
"`We note that under the ore tenus standard of review, the trial court's findings of fact based on oral testimony, and a judgment based on those findings, are given a presumption of correctness. A judgment based on such findings will not be reversed unless it is shown to be plainly and palpably wrong. The appellate courts are not allowed to substitute their own judgment for that of the trial court if the trial court's decision is supported by reasonable inferences to be drawn from the evidence. The reason for giving such deference to the trial judge's findings based on disputed evidence in ore tenus proceedings is that the trial judge has the benefit of observing the witnesses' manner and demeanor and has the better opportunity to pass upon the credibility of their testimony.'

"Ex parte Pielach, 681 So.2d 154, 154-55 (Ala.1996) (citations omitted). `Under the ore tenus rule, the trial court's judgment and all implicit findings necessary to support it carry a presumption of correctness and will not be reversed unless found to be plainly and palpably wrong.' Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 *434 So.2d 375, 378 (Ala.1992) (citations and internal quotation marks omitted)."
Creel v. Crim, 812 So.2d 1259, 1260-61 (Ala.Civ.App.2001). This court has further stated that:
"However, when the trial court improperly applies the law to facts, no presumption of correctness exists as to the trial court's judgment. Allstate Ins. Co. v. Skelton, 675 So.2d 377 (Ala.1996); Marvin's, Inc. v. Robertson, 608 So.2d 391 (Ala.1992); Gaston [v. Ames], 514 So.2d [877,] 878 [(Ala.1987)]; Smith v. Style Advertising, Inc., 470 So.2d 1194 (Ala.1985); League v. McDonald, 355 So.2d 695 (Ala.1978). `Questions of law are not subject to the ore tenus standard of review.' Reed v. Board of Trustees for Alabama State Univ., 778 So.2d 791, 793 n. 2 (Ala.2000). A trial court's conclusions on legal issues carry no presumption of correctness on appeal. Ex parte Cash, 624 So.2d 576, 577 (Ala. 1993). This court reviews the application of law to facts de novo. Allstate, 675 So.2d at 379 (`[W]here the facts before the trial court are essentially undisputed and the controversy involves questions of law for the court to consider, the [trial] court's judgment carries no presumption of correctness.')."
City of Prattville v. Post, 831 So.2d 622, 628 (Ala.Civ.App.2002).

I. Third-Party Beneficiary

Morris Concrete first argues that the trial court erred by determining that Warrick was a third-party beneficiary to a contract between it and Childress.
"`[I]t has long been the rule in Alabama that one who seeks recovery as a thirdparty beneficiary of a contract must establish that the contract was intended for his direct, as opposed to his incidental, benefit.' Mills v. Welk, 470 So.2d 1226, 1228 (Ala.1985). `To recover under a third-party beneficiary theory, the complainant must show: 1) that the contracting parties intended, at the time the contract was created, to bestow a direct benefit upon a third party; 2) that the complainant was the intended beneficiary of the contract; and 3) that the contract was breached.' Sheetz, Aiken & Aiken, Inc. v. Spann, Hall, Ritchie, Inc., 512 So.2d 99, 101-02 (Ala.1987)."
McGowan v. Chrysler Corp., 631 So.2d 842, 848 (Ala.1993).
At trial, Childress testified (1) that he informed Charlie Tolbert, a general manager at Morris Concrete, that he was going to purchase some concrete for Warrick as part of an agreement that they had made to exchange the concrete for a down payment on a pickup truck; (2) that he specified that the concrete needed to be able to withstand 3,000 PSI; and (3) that no one from Morris Concrete told him that he could not purchase the concrete for another person's use. Warrick also testified that, when he was ready for the concrete to be delivered, he telephoned Morris Concrete's plant, told the person on the line about his arrangement with Childress, and requested that the concrete be delivered. Morris Concrete subsequently delivered the concrete to Warrick. There was other evidence to support a finding that there was a contract between Childress and Morris Concrete and that the concrete provided did not meet the 3,000 PSI specification.
Representatives of Morris Concrete testified that it was against company policy for employees to use their employee discount to purchase concrete for other parties; however, that testimony did not tend to dispute Childress's testimony that he had informed Charlie Tolbert, who did not testify at trial, about his arrangement with Warrick before he purchased the concrete. In light of the testimony presented and the *435 presumption of correctness afforded a trial court's judgment under the ore tenus standard of review, we cannot say that the trial court erred by determining that Warrick was a third-party beneficiary to the contract between Childress and Morris Concrete.

II. Breach of Implied Warranties

Morris Concrete also argues that the trial court erred by determining that it had breached the implied warranties of merchantability and fitness for a particular purpose. Morris Concrete further contends that it was the "manufacturer" not the "seller" of the concrete, relying on this court's holding in Tucker v. General Motors Corp., 769 So.2d 895, 901 (Ala.Civ.App.1998)(reversed, in part, on other grounds, Ex parte General Motors Corp., 769 So.2d 903 (Ala.1999)), that those implied warranties apply only to sellers and not to manufacturers. In Ex parte General Motors Corporation, supra, our supreme court noted:
"Implied warranties are governed by Alabama's version of the UCC, codified in Title 7, Ala.Code 1975. Section 7-2-315, Ala.Code 1975, provides:
"`Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under Section 7-2-316 an implied warranty that the goods shall be fit for such purpose.'
"....
"... The implied warranty of merchantability is found in § 7-2-314(1), Ala.Code 1975, which provides:
"`Unless excluded or modified (Section 7-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.'
"Subsection (2)(c) of that Code section provides that to be considered merchantable, goods must be `fit for the ordinary purposes for which such goods are used.' As the Court of Civil Appeals held, `[t]o establish his claim of breach of the implied warranty of merchantability, [the claimant] must "`prove the existence of the implied warranty, a breach of that warranty, and damages proximately resulting from that breach.'"' [Tucker v. General Motors Corp.,] 769 So.2d [895,] 901 [(Ala.Civ.App.1998)] (quoting Barrington Corp. v. Patrick Lumber Co., 447 So.2d 785, 787 (Ala.Civ. App.1984), quoting, in turn, Storey v. Day Heating and Air Conditioning Co., 56 Ala.App. 81, 83, 319 So.2d 279, 280 (1975))."
769 So.2d at 911-12.
The previous discussion and consideration of the trial court's holding that Warrick was a third-party beneficiary to a contract between Childress and Morris Concrete does not support Morris Concrete's contention that it is a manufacturer under the facts of this case. Rather, Morris Concrete was the seller of the concrete to Childress, who was, in turn, purchasing it for Warrick's use. Section 7-2-318, Ala. Code 1975, applies to the circumstances presented in this case; that section states:
"A sellers' warranty, whether express or implied, extends to any natural person if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section."
Accordingly, the implied warranties of merchantability and fitness for a particular purpose were available to Warrick, and the *436 trial court properly considered whether Morris Concrete breached those warranties.
A. Implied Warranty of Merchantability
There was testimony produced at trial by several witnesses which confirmed that there were problems with the concrete supplied by Morris Concrete. Varying testimony as to the cause was provided, i.e., the use of bad sand in the concrete mixture, a high amount of air or water in the concrete mixture, or some combination of those and other factors. Thus, there was testimony from which the trial court could have found that the concrete was not "fit for the ordinary purposes for which such goods are used," § 7-2-314(2)(c); therefore, it did not err by determining that this implied warranty had been breached.
B. Implied Warranty of Fitness for a Particular Purpose
Childress testified at trial, in pertinent part, as follows:
"Q. Now, did you specify to Morris Concrete what strength you wanted?
"A. Yes, sir.
"Q. Did you tell them what this purpose was for?
"A. Yes, sir.
"Q. What did you tell him?
"A. I told him it was going into a tire shop.
"Q. You told them specifically it was going to a tire shop?
"A. Yes, sir, going to a tire shop."
Although conflicting testimony was also presented as to this issue, based upon Childress's testimony the trial court could have determined that Morris Concrete was aware of the particular purpose for which the concrete was to be used and that Childress had relied on its skill to provide concrete that met the 3,000 PSI specification.

III. Negligence

Morris Concrete also argues that Warrick provided no evidence to support an allegation of negligence. As mentioned in note 1, supra, Warrick's complaint did not clearly contain an allegation of negligence. However, at trial, when the trial court informed the parties' counsel that it believed the complaint did contain an allegation of negligence within Warrick's breach-of-warranty claim, counsel for Morris Concrete stated, in pertinent part:
"Your Honor, as the corporate attorney for Morris [Concrete], we filed a crossclaim back against Mr. Childress, and although I'm not going to argue that vehemently at this time, I do want to address what you were asking a minute ago concerning whether there can be more than one count in a claim, Your Honor. I think, generally speaking, we operate as lawyers on notice of pleadings, we look at what the pleading says.
"Also, I think, Your Honor, throughout this trial  first of all, I think Your Honor has the ability to conform to the evidence that's been put before you. I think at best what has been put before you is potentially negligence on the part of Morris Concrete, if at all, Your Honor  I can't sit here and tell you that my client committed an act as their attorney, but I will say if the testimony put before you is believed, then the testimony was that there were certain problems at the concrete plant that should have come to light and they should have been taken care of and they didn't, is that negligence? That's up to you to make that decision, Your Honor."
Thus, Morris Concrete's counsel conceded that the testimony presented at trial, *437 if believed by the trial court, could support a count of negligence. Accordingly, it cannot now argue that the trial court's finding of negligence requires reversal. See Atkins v. Lee, 603 So.2d 937, 945 (Ala.1992)("A party may not predicate an argument for reversal on `invited error,' that is, `error into which he has led or lulled the trial court'" (quoting Dixie Highway Express, Inc. v. Southern Ry., 286 Ala. 646, 651, 244 So.2d 591, 595 (1971), and citing State Farm Mut. Auto. Ins. Co. v. Humphres, 293 Ala. 413, 418, 304 So.2d 573, 577 (1974))).

IV. Amount of Damages

Morris Concrete next argues that the trial court's award of $75,000 in damages to Warrick was excessive. At the close of trial, Warrick's counsel and the trial court engaged in the following discussion:
"[Warrick's counsel:] We're asking for the twenty-seven thousand and change that's there.[2] We're asking for lost profits.[3] We've been back and forth with lost profits whether it's gross profits, whether it's gross income, however Your Honor looks at it, if ... twenty-five thousand dollars was the gross profits that were made, not gross sales, in the year `99 and 2000, both of them are right around there together,[4] if it's 40 percent of that, that's ten thousand dollars a year, and we've been 18 months now, giving them the benefit of the doubt. That's fifteen thousand dollars right off the top with an approximation of 40 percent that he's due for lost profits.
"And on top of that, he gets to walk by every day and look at a twenty-five thousand dollar project that he can store stuff in. It's worthless. It's sitting there right now worthless. That's something he has to go with and it's not his fault. It's something that is Morris Concrete's fault.
"....
"THE COURT: Is that what you're asking for is forty-seven thousand dollars?[5]
"[Warrick's counsel]: Yes, sir. And whatever the Court wishes to consider for mental anguish.
"THE COURT: Okay."
Because the trial court awarded $33,000 in excess of what Warrick requested (see note 5, supra) Morris Concrete contends that that amount represents the mentalanguish damages awarded by the trial court. It argues that the trial court erred by awarding mental-anguish damages because, subject to limited exceptions not applicable to this case, they are generally not allowed in breach-of-contract actions and that they also are not allowed in negligence actions unless the plaintiff was in a "zone of danger." It further argues that Warrick failed to present sufficient evidence *438 to support an award for lost profits and that he failed to mitigate his damages.
A. Mental-Anguish Damages in Breach-of-Contract Actions
In Bowers v. Wal-Mart Stores, Inc., 827 So.2d 63 (Ala.2001)(hereinafter referred to as "Bowers II"), our supreme court observed:
"An award of damages for mental anguish generally is not allowed in breachof-contract actions in Alabama. Ruiz de Molina v. Merritt & Furman Ins. Agency, 207 F.3d 1351 (11th Cir.2000), citing Vincent v. Blue Cross-Blue Shield, Inc., 373 So.2d 1054, 1056 (Ala.1979).
"`The ground on which the right to recover such damages [for mental anguish] is denied, is that they are too remote, were not within the contemplation of the parties, and that the breach of the contract is not such as will naturally cause mental anguish. "Yet where the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the feelings of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering, it is just that damages therefor be taken into consideration and awarded."`

"F. Becker Asphaltum Roofing Co. v. Murphy, 224 Ala. 655, 656, 141 So. 630, 631 (1932) (citations omitted). Exceptions to the general rule on the basis noted above have been made in the areas of contracts to construct or repair, or to provide utilities to, a house where the breach impacted the habitability of the house. See Orkin Exterminating Co. v. Donavan, 519 So.2d 1330 (Ala. 1988); Alabama Power Co. v. Harmon, 483 So.2d 386 (Ala.1986); B & M Homes, Inc. v. Hogan, 376 So.2d 667 (Ala.1979). Exceptions have also been made for contracts of carriage, see Nashville C.St.L. Ry. v. Campbell, 212 Ala. 27, 101 So. 615 (1924); for breach of a contract to deliver a baby, when the baby was stillborn, see Taylor v. Baptist Med. Ctr., Inc., 400 So.2d 369 (Ala.1981); and for breach of warranty in the sale of a `lemon,' a newly manufactured car that frequently broke down at intersections, see Volkswagen of America, Inc. v. Dillard, 579 So.2d 1301, 1304 (Ala.1991) (`"These cases have not required mental anguish to be corroborated by the presence of physical symptoms; the only requirement in such cases is the presentation of evidence of mental anguish. Thereafter, the question of damages for mental anguish becomes a question of fact for the jury to decide."` (quoting B & M Homes, Inc. v. Hogan, 376 So.2d 667, 671 (Ala.1979))).
"....
"... `In Alabama the general rule is that mental anguish is not a recoverable element of damages arising from breach of contract.' B & M Homes, Inc. v. Hogan, 376 So.2d 667, 671 (Ala.1979). Speaking of exceptional cases in which Alabama law does allow mental-anguish claims resulting from a breach of contract, the United States Court of Appeals for the Eleventh Circuit has said, `These cases deserve special treatment because it is highly foreseeable that egregious breaches of certain contracts  involving one's home or deceased loved one, for example  will result in significant emotional distress.' Ruiz de Molina, 207 F.3d 1351 at 1359-60, citing Sexton v. St. Clair Fed. Sav. Bank, 653 So.2d 959, 962 (Ala.1995). Except for the identified types of emotionally intertwined cases to which the Eleventh Circuit refers, we have declined to extend emotional-distress damages to contract claims. We have, for example, rejected as an inappropriate *439 basis for a mental-anguish claim the breach of a contract to sell a boat. See Wellcraft Marine v. Zarzour, 577 So.2d 414, 419 (Ala.1990). The Eleventh Circuit, relying on Alabama law, rejected a mental-anguish claim stemming from the breach of an insurance contract. See Ruiz de Molina, supra."
827 So.2d at 68-70.
None of the limited exceptions discussed in Bowers II exist in the present case. Accordingly, the trial court could not, as a matter of law, award mental-anguish damages to Warrick based on his breach-ofcontract and breach-of-warranty claims.
B. Mental-Anguish Damages in Negligence Actions
In Wal-Mart Stores, Inc. v. Bowers, 752 So.2d 1201 (Ala.1999)(hereinafter referred to as "Bowers I"), our supreme court observed:
"In negligence actions, Alabama follows the `zone-of-danger' test, which limits recovery of mental anguish damages `to those plaintiffs who sustain a physical injury as a result of a defendant's negligent conduct, or who are placed in immediate risk of physical harm by that conduct.' AALAR, Ltd., Inc. v. Francis, 716 So.2d 1141, 1147 (Ala.1998). Accord White Consol. Indus., Inc. v. Wilkerson, 737 So.2d 447, 449 (Ala.1999). In White Consolidated Industries, the plaintiffs' house burned as the result of a defect in an air conditioner they had recently purchased and installed. They suffered property damage but no physical injury. They sought mental-anguish damages based on a claim made under the Alabama Extended Manufacturer's Liability Doctrine (`AEMLD'). This Court, even though the case was an AEMLD case and not a traditional negligence case, applied the zone-of-danger test, holding that, because `at the time of the fire [the plaintiff homeowners] were away from home and at their places of employment,' they were not within the zone of danger. 737 So.2d at 449. Therefore, this Court concluded, the trial court erred in allowing the jury to award mental-anguish damages to the homeowners. Id.

"The Bowerses argue that, in a negligence case, the plaintiff, even if the plaintiff is not in a zone of danger, should be allowed to recover damages for mental anguish resulting from an incident that causes damage to property if the damage to the property is committed under circumstances of insult or contumely. See Reinhardt Motors, Inc. v. Boston, 516 So.2d 509, 511 (Ala.1986). We disagree.
"Under Alabama law, it is well established that damages for mental anguish are not recoverable in tort where the tort results in mere injury to property unless the damage to property is committed under circumstances of insult or contumely....
"The `insult-or-contumely' exception does not, however, apply in cases of `mere negligence.' See Louisville & N. R.R. v. Fletcher, 194 Ala. 257, 259, 69 So. 634, 635 (1915). In Fletcher, this Court explained that a plaintiff cannot recover mental-anguish damages based on damage to property that occurs as the result of negligence:
"`We do not doubt that, in assessing damages for a trespass to property, mental suffering, established by the proof as the proximate and natural consequence of the trespass, and attended with circumstances of insult and contumely, is to be taken into account and compensated as a matter of right. In trespass, damages take a wide range.

*440 "`Where, as in the case before us, the wrong consists in the nondelivery of the baggage of a passenger, the result of mere negligence, the only damages that may be awarded are damages compensating the proximate resulting pecuniary loss  the loss of the baggage at the time of the nondelivery, or at any time subsequent thereto, with interest.'
"194 Ala. at 259-60, 69 So. at 635. Thus, in negligence actions involving damage only to property, the `insult or contumely' exception does not apply. Instead, in negligence actions, the applicable test is the zone-of-danger test. See AALAR, Ltd., Inc., 716 So.2d at 1147; White Consol. Indus., 737 So.2d at 449."
752 So.2d at 1203-04.
Our review of the record fails to show that Warrick produced any evidence that would support a finding that he was in a zone of danger as a result of Morris Concrete's negligence. See Bowers I. Thus, an award of mental-anguish damages as to this claim would also be erroneous.
C. Lost Profits
In Kirkland & Company of Anniston, P.C. v. A & M Food Service, Inc., 579 So.2d 1278 (Ala.1991), our supreme court observed:
"Lost profits are recoverable where it reasonably appears that they would have been made if the contract had been performed and where it appears that their loss necessarily followed the breach. Paris v. Buckner Feed Mill, Inc., 279 Ala. 148, 182 So.2d 880 (1966).... In Alabama, anticipated profits of an unestablished business may be recovered if such damages are proved with `reasonable certainty.' Super Valu Stores, Inc. v. Peterson, 506 So.2d 317 (Ala.1987); Morgan v. South Central Bell Telephone Co., 466 So.2d 107 (Ala.1985). In Morgan, supra, this Court confirmed that the `reasonable certainty' standard for proving profits of an unestablished business prevails in Alabama:
"`The rule in Alabama concerning proof of lost profits was set forth in Paris v. Buckner Feed Mill, Inc., 279 Ala. 148, 149, 182 So.2d 880, 881 (1966), by Justice Simpson:
"`"... In order that it may be a recoverable element of damages, the loss of profits must be the natural and proximate, or direct, result of the breach complained of and they must also be capable of ascertainment with reasonable, or sufficient, certainty, or there must be some basis on which a reasonable estimate of the amount of the profit can be made; absolute certainty is not called for or required."

"`This general rule is applied in most states, and is referred to as the rule of "reasonable certainty." The United States Supreme Court, in Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931), stated that this rule precludes only those damages not resulting from the wrong, allowing damages stemming from the wrong but uncertain in amount.
"`In essence, the rule dictates that recovery will ensue despite the fact damages cannot be calculated with mathematical certainty or without difficulty where they are clearly proximately caused by the wrong.'
"466 So.2d at 115-16. (Emphasis added in Morgan). See Super Valu Stores, supra. Thus, verdicts awarding lost profits will be affirmed if the claimant provides a `basis from which the jury could, with reasonable certainty, calculate the amount of profits which were *441 lost as a result of [the wrongdoer's actions].' Morgan, supra, at 116 (emphasis in original); Super Valu Stores, supra, at 327."
579 So.2d at 1285-86.
At trial, Warrick testified concerning his anticipated lost profits as follows:
"Q. How long was it after the slab was put down and the building up were you going to get going with the tire shop?
"A. We [were] going to get it going immediately. Like I said, we had already talked to Maco about putting in the lifts and having the tire company who I was  who I buy my tires from when I buy new tires, about putting in a stock of new tires and rim tire changer and a computer balancer and stuff. We already had this stuff organized to be put in the building on a lease purchase plan.
"Q. You already had everything ready to go?
"A. Yes, sir.
"Q. How many days were you going to have that?
"A. Well, actually, three.
"Q. Three days for you to work on the vehicles?
"A. To change the tires.
"Q. Change tires. Do you have an estimation of how much business you would have gained as a result of the tire shop?
"[Morris Concrete's counsel]: Your Honor, I object. This is pure speculation.
"THE COURT: You're going to have to lay some better predicate than that.
"BY [Warrick's counsel]:
"Q. Why do you want to put a tire shop there, Jessie?
"A. Well, we're in a high traffic area there. Highway 98 has gotten to be a busy place. And if you go down there and look at the amount of construction that's went on there in the last few years, Barnwell is not a small community anymore. So we have a lot of people that's living in that area there with no tire shop within 10 to 15 miles of there.
"Q. Where is the closest tire shop towards the Eastern Shore?
"A. Fairhope Tire.
"Q. Where is the closest tire shop towards Central Baldwin?
"A. It would be Foley.
"Q. How many miles is each one apart would you estimate?
"A. I'm going to guess 30 miles between the two. We're in the middle.
"Q. With your auto store, automotive repair store, do you do any type of tire work there?
"A. We've been repairing tires. We've got a tire machine. It's an older machine, but we can do about 85 to 90 percent of the tires....
"....
"Q. And you weren't selling new tires were you?
"A. No, sir, not per se, no, sir.
"Q. Not to the general public?
"A. No.
"Q. Based on  did you have conversations with clients and customers?
"A. Yes, everybody just about that we did tire repair for, and we sold a few used tires for spare tires and everybody said why don't you put in a tire store. If we got a flat tire, we've got to go all the way to Foley or Fairhope.
"Q. Based on the conversations and the information that you obtained from your business, did you perceive this to be a profitable jump for you?

*442 "A. Yes, sir.
"Q. Do you have  based on that information, do you have some type of estimation about a percentage of what your gross profit would increase?
"[Morris Concrete's counsel]: Again, Your Honor, objection, speculation.
"[Warrick's counsel]: Of course, it's speculation. The whole thing is speculation, Judge. He's entitled to 
"THE COURT: How much were you doing in tire work beforehand?
"[Warrick]: We weren't doing a whole lot of tire work, you know; maybe five or six thousand dollars a year. But like I said, we were only repairing tires; we [weren't] selling new tires. We wanted to get into the new tire business and we figured we could sell at least a couple of sets of tires a day.
"[Warrick's counsel]: That's what lost profits [are], ... pure speculation.
"By [Warrick's counsel]:
"Q. What do you estimate your increased revenue would be?
"A. Well, if we could sell a couple of sets of tires a day, which is not really a lot of tires.
"Q. Give me what you believe, based on your income from `99/2000, how much it would increase percent-wise.
"A. We felt 40 percent at least.
"Q. That's what you estimate?
"A. We [were] actually building a building that was bigger than the one we've got with a lot more equipment in it.
"Q. Okay. So your estimate is based on 40 percent; is that right?
"A. Yes, sir."
The trial court further questioned Warrick concerning his anticipated lost profits as follows:
"Q. Let's talk about this money aspect. If you're going to get  let me see if I understand what you're saying. You think your business would increase by 40 percent?
"A. Yes, sir.
"....
"Q. But you know you haven't given me a number to base this 40 percent on.
"A. Well 
"Q. Are you saying that your gross sales would go up 40 percent, which means from one hundred you would go to one hundred and forty thousand?
"A. I think it would be more than that because you don't make that much profit on a tire, if you understand what I'm saying.
"Q. How much do you make on the tire?
"A. Basically about 20 percent.
"Q. 20 percent of what?
"A. Of the cost of the tire. If it's a sixty-dollar tire, you've got twelve dollars, plus the mounting and balancing.
"Q. Okay. And you're talking about twenty percent, you would clear 20 percent after you've done the mounting, balancing, the stem, and all that?
"A. It would be a little more than that, because we get twelve dollars to mount and balance them.
"Q. So you figured that in?
"A. Well, no. I figured the 20 percent would be off the sale of the tire.
"Q. The tire itself would be marked up 20 percent?
"A. Yes.
"Q. And then you're going to do the mounting and balancing which is all labor?
"A. Yes, sir.
"THE COURT: Okay."
*443 Despite the trial court's clarification of the amount of money that Warrick would make from each tire he sold, we conclude that the testimony presented failed to meet the "reasonable-certainty" test discussed in Kirkland & Company of Anniston, supra, because Warrick failed to provide any reasonable basis to support his anticipated sale of two sets of tires per day. The basis provided through his testimony  that there were no tire stores in his immediate area and that from conversations with customers he estimated that if he opened a tire shop he could sell two sets of tires each day  was pure speculation and was acknowledged as such by his counsel. Accordingly, we conclude that the trial court erred by awarding Warrick damages for lost profits.
D. Failure to Mitigate
Morris Concrete also contends that Warrick failed to mitigate his damages because, it says, he was aware that there were problems with the concrete slab before he began the construction of his tire shop. The trial court was presented with conflicting testimony concerning this issue; therefore, in light of the presumption of correctness afforded a trial court's judgment under the ore tenus standard of review, we cannot conclude that the trial court's holding on this issue was erroneous.

V. Damages Award on Childress's Cross-Claim

Morris Concrete next argues that the trial court erred by awarding $75,000 on Childress's cross-claim, in which he requested that the trial court order that he be indemnified for any amount he was adjudged to be liable to Warrick. The trial court's order did not make any provision as to the amounts that Childress or Morris Concrete, individually, were obligated to pay Warrick; the order appears to find them jointly responsible. However, in reading the trial court's judgment in light of what was requested in Childress's cross-claim, we conclude that Childress is responsible for payment to Warrick in the amount of the judgment, subject to this court's reversal as to the amount of damages awarded, and Morris Concrete is responsible to indemnify Childress.[6]

VI. Entry onto Warrick's Property

Morris Concrete also argues that the trial court erred by not allowing it to enter onto Warrick's property to test the concrete during the discovery phase of this litigation. Our supreme court has stated that "[a] challenge to a trial court's ruling on a discovery matter attacks the court's exercise of its broad discretion, and a petition for the writ of mandamus is the correct means for seeking appellate review of a discovery ruling. Ex parte Compass Bank, 686 So.2d 1135 (Ala.1996)." Ex parte Union Sec. Life Ins. Co., 723 So.2d 34, 37 (Ala.1998). However, it has also stated that an adequate remedy is generally available by appeal, unless an exceptional case is presented. See Ex parte Ocwen Fed. Bank, FSB, [Ms. 1002225, March 28, 2003] ___ So.2d ___, ___ (Ala.2003)("Generally, an appeal of a discovery order is an adequate remedy, notwithstanding the fact that that procedure may delay an appellate court's review of a petitioner's grievance or impose on the petitioner additional expense; our judicial system cannot afford immediate mandamus review of every discovery order." *444 (footnote omitted)).[7] Accordingly, it is appropriate for us to address this issue.
"Discovery matters are within the trial court's sound discretion, and this Court will not reverse a trial court's ruling on a discovery issue unless the trial court has clearly exceeded its discretion."
Ex parte Ocwen, ___ So.2d at ___ (citing Home Ins. Co. v. Rice, 585 So.2d 859, 862 (Ala.1991)). It was undisputed that Morris Concrete had already had the concrete tested by an engineering and testing firm of its choosing prior to the filing of this lawsuit and that, at trial, Bryan Robertson, an employee of the engineering and testing firm, testified that according to industry standards the concrete in question should have reached its maximum PSI threshold in 28 days; Robertson tested the concrete in question over 75 days after it had been poured. Moreover, the case action summary indicates that the trial court requested that Morris Concrete submit an affidavit in support of its request to enter onto Warrick's property; the record contains no indication that a supporting affidavit was filed. Under these circumstances, we conclude that the trial court did not err by not allowing Morris Concrete to test the concrete in question for a second time.

VII. Denial of the Motion for a New Trial

Morris Concrete's last argument is that the trial court erred by denying its motion for a new trial without conducting a hearing. In Bell v. Greer, 853 So.2d 1015, 1019 (Ala.Civ.App.2003), this court noted:
"According to Rule 59(g), Ala. R. Civ. P., postjudgment motions `shall not be ruled upon until the parties have had opportunity to be heard thereon.' Rule 59(g), however, has not been interpreted to require a hearing in all cases. Our Supreme Court has established that
"`the denial of a postjudgment motion without a hearing thereon is harmless error, where (1) there is either no probable merit in the grounds asserted in the motion, or (2) the appellate court resolves the issues presented therein, as a matter of law, adversely to the movant, by application of the same objective standard of review as that applied in the trial court.'

"Historic Blakely Authority v. Williams, 675 So.2d 350, 352 (Ala.1995)."
Because we have resolved the issues that were presented in Morris Concrete's motion adversely to it on all counts, except as to the amount of the trial court's damages award, we will not hold the trial court in error for its failure to conduct a hearing on Morris Concrete's motion for a new trial.

VIII. Conclusion

In summary, because there was no basis to support the trial court's award of damages for mental anguish in this case and because there was not sufficient evidence to support an award of damages for lost profits, we reverse the trial court's judgment as it relates to its award of damages and remand the cause for it to enter an *445 order detailing the amount of damages it intended to award Warrick as compensation for the demolition and reconstruction of the concrete slab and building. Any amounts that were awarded as damages for mental anguish and lost profits were made in error and the trial court is directed to deduct that amount from its award. The trial court shall return its order to this court within 14 days from the release of this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
YATES, P.J., and THOMPSON and PITTMAN, JJ., concur.
MURDOCK, J., concurs in the result.

On Return from Remand
CRAWLEY, Judge.
Pursuant to this court's directive, the trial court has returned an order awarding compensatory damages to Jessie Warrick solely for the demolition and reconstruction of his building; the award does not include an award for lost profits or mental anguish. Upon review of the findings contained in that order, we conclude that the amount awarded is supported by the evidence and that the judgment is due to be affirmed.
AFFIRMED.
YATES, P.J., and THOMPSON, PITTMAN, and MURDOCK, JJ., concur.
NOTES
[1] At trial, after the parties had presented their cases, the trial court determined that Warrick's complaint contained an allegation of negligence, or that the evidence had at least amended the pleadings to include a negligence count.
[2] Vernon Berga, Jr., a contractor, testified and provided a written estimate that was admitted into evidence indicating that to tear down and replace the existing structure on the concrete slab would cost $27,325. He further testified that his written estimate was more that a year old and that he could no longer do the job for the price he had provided on the estimate.
[3] Warrick testified that he believed that his business's income would have increased 40 percent as a result of the opening of his tire shop; he anticipated that he would have been able to sell two sets of tires per day.
[4] Warrick's 1999 and 2000 tax returns were admitted into evidence. In 1999, he reported $24,928 as gross profit from his business; in 2000, he reported $25,038.
[5] Seemingly, the trial court incorrectly added the amounts Warrick's counsel had requested, $27,000 and $15,000  which actually total $42,000.
[6] In Childress's brief, he acknowledges that he requested to be indemnified only by Morris Concrete.
[7] See also Harrison v. Harrison, 733 So.2d 435, 438 (Ala.Civ.App.1999)(Crawley, J., concurring in part and dissenting in part)(quoting Chris Myers Pontiac-GMC, Inc. v. Lewter, 697 So.2d 478, 485 (Ala.Civ.App.1997)(Crawley, J., concurring in part and dissenting in part)):

"`Just because [a party] could have resorted to mandamus as a means of achieving pre-trial review of a trial court's discovery order does not mean that [she] had to resort to mandamus or be precluded from raising the issue on appeal. See, e.g., Rankin v. First Nat'l Bank of Alabama, 437 So.2d 503 (Ala.1983). If that were the case, every discovery issue that was not the subject of a pre-trial extraordinary writ would be barred from post-trial appellate review.'"