Rel: June 26, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2025-2026

_____

### CL-2026-0049

_____

## A.A.

v.

## C.H. and J.H.

### Appeal from Jefferson Juvenile Court
### (JU-25-648.01)

EDWARDS, Judge.

A.A. appeals from a judgment entered by the Jefferson Juvenile Court ("the juvenile court") finding that he is not the presumed father of A.Z.A.-H. ("the child"), finding the child dependent, and awarding custody of the child to C.H. ("the maternal uncle") and J.H. ("the

maternal aunt").  For the reasons set forth below, we reverse the juvenile court's judgment and remand the case for additional proceedings.

It is undisputed that L.C.H. ("the mother") was the mother of the child and that she developed metastatic brain cancer and died on March 31, 2025.  On April 9, 2025, the maternal uncle and the maternal aunt (collectively referred to as "the maternal custodians") filed a petition in the juvenile court requesting that the child be declared dependent.  In that petition, the maternal custodians asserted that A.A. ("the putative father") was the child's putative father and that he had "perpetrated a fraud on the mother by attempting to enter a marriage with her" in May 2022 in the country of Georgia, despite the fact that the putative father was already married.

The juvenile court appointed a guardian ad litem for the child and awarded the maternal custodians pendente lite custody of the child.  The juvenile court held a hearing on the maternal custodians' dependency petition on May 20, 2025.  Following that hearing, the juvenile court entered an order adjudicating the child dependent.  That order does not indicate that the child had a legal father, and the maternal custodians appear to have been the only parties present at the hearing.  The juvenile

court's handwritten findings attached to the May 2025 order indicate that the maternal custodians presented evidence to support their assertion that the marriage of the mother and the putative father was a nullity and that the putative father was not the legal father of the child.

On June 16, 2025, 27 days after the juvenile court entered the May 20, 2025, dependency order, the father filed a motion to reconsider or to set aside that order based on his assertion that he was the child's presumed father, that no effort had been made to contact him regarding the child, that the child's maternal relatives had intentionally withheld information from him to prevent him from contesting the dependency petition, and that he had become aware of the dependency action on June 6, 2025.[1] The juvenile court held a hearing on the putative father's motion on July 28, 2025, and, on August 19, 2025, entered an order setting aside the May 20, 2025, order and setting the case for a new trial.[2]

---

[1]We assume that the juvenile court treated this motion as being made pursuant to Rule 60(b), Ala. R. Civ. P.

[2]In its order, the juvenile court noted that, in addition to considering the parties' arguments at that hearing, it had attempted to listen to a digital recording of the May 20, 2025, hearing but that the recording device "was inoperable and did not record any hearings" on May 20, 2025.

3

The putative father, through his counsel, requested several continuances of the setting of the new trial based on his inability to travel to the United States from the United Arab Emirates ("the UAE"), where he was employed as a professor. The putative father explained in his motions and supporting documentation that he had been unable to obtain a visa to travel to the United States because he had been indicted in Arizona for sexual assault. The putative father also requested that he be permitted to appear at the trial through a teleconferencing application. The juvenile court granted some of the putative father's motions for a continuance but denied his request to appear at the trial virtually.

The juvenile court held the new trial on November 13, 2025. The putative father's counsel presented an oral motion at the beginning of the trial, again requesting that the putative father be permitted to testify through a teleconferencing application. The juvenile court denied that motion. The maternal uncle offered the only testimony at trial. The record reveals the following information.

The putative father is a citizen of Bosnia and Herzegovina, and, at the time of the trial, he had been employed as a professor at the American University of Sharah in the UAE for 16 years. The putative father had

4

also been employed as a professor at Arizona State University ("ASU") at some point before the birth of the child. As noted above, at the time of the November 2025 trial, the putative father had been indicted for an alleged sexual assault that had occurred during his tenure at ASU, and it appears that a trial in that criminal case is scheduled for the summer of 2026.[3]

The record indicates that the putative father was married to D.T. before July 2022. In July 2022, the putative father and D.T. became divorced by a judgment of the Coconino County Superior Court in Arizona ("the Arizona divorce judgment").[4] The putative father was residing in the UAE at the time of the entry of the Arizona divorce judgment.

The mother was a United States citizen and was born in Alabama. It is unclear when the mother and the putative father began a romantic

---

[3]The record does not reveal any other facts concerning the putative father's prosecution in Arizona. Comments made by the putative father's counsel at the November 2025 trial suggest that the putative father was indicted in Arizona at least five years before the child was born.

[4]That judgment awarded the putative father and D.T. joint legal custody of their minor child and appears to have awarded sole physical custody of that child to D.T., subject to the putative father's visitation rights.

relationship. However, it appears undisputed that the mother and the putative father were cohabiting at the putative father's residence in the UAE in May 2022. On May 20, 2022, the mother and the putative father traveled to the country of Georgia and purported to enter into a marriage contract. The record contains a marriage certificate purporting to marry the mother and the putative father, and that certificate bears the stamp of the Ministry of Justice of Georgia.[5] Thus, it appears undisputed that the mother and the putative father attempted to enter into a valid marriage contract before the entry of the Arizona divorce judgment. According to the maternal uncle, the mother did not learn of the putative father's prior marriage until sometime in 2024. The putative father's trial counsel appears to have conceded at the conclusion of the trial that the putative father's marriage to the mother was invalid.

The child was born in the UAE on October 1, 2022. The child was issued a United States Consular Report of Birth Abroad ("the consular certificate") by the United States Department of State, certifying that the

---

[5]The record contains a copy of the marriage certificate that appears to be translated into English and an original or copy of the marriage certificate in Georgian.

6

child was a United States citizen by birth. The child's UAE birth certificate and the consular certificate list the putative father as the child's father. The maternal uncle testified that, after the child was born, the child resided in the putative father's residence with the putative father and the mother. He further stated that the putative father referred to the child as his daughter and that he was not aware of any other individual who had held himself out as the child's father.

The maternal uncle testified that several maternal relatives had visited the mother at the putative father's residence on two occasions in 2022, including one visit in November 2022, after the child was born. It appears that the child resided with the mother and the putative father in the UAE until she was between 16 and 18 months old. The maternal uncle stated that the mother was diagnosed with metastatic brain cancer shortly after the child was born. The mother and the child frequently traveled between the UAE and the United States to obtain treatment for the mother.[6] According to the maternal uncle, the mother and the child

---

[6]The mother and the child stayed with the mother's parents when they were in the United States for the mother's treatments.

did not return to the UAE after April 2024 because of the mother's illness. As discussed above, the mother died in March 2025.

After the mother's death, the child resided with the maternal custodians, and she continued to reside with them at the time of the November 2025 trial. The maternal uncle stated that he and the maternal aunt had reared the child after the mother's death, including placing the child on their insurance and overseeing her education.

The maternal uncle testified that he did not know whether the putative father had provided the mother with financial support for her cancer treatment or if he had financially supported the child while she and the mother were in the United States. He asserted that the putative father had not traveled to the United States to visit the child when the mother was undergoing treatments or since the mother had died. According to the maternal uncle, the putative father had communicated with the mother during her treatments and had communicated with the child through a videoconferencing platform. The maternal uncle stated that the putative father had not communicated with the child in the six months preceding the November 2025 trial. He also stated that, on the occasions when the putative father had contacted the child since the

8

mother's death, the putative father had become confrontational with the maternal custodians over the case. The maternal uncle asserted that he would not prevent the putative father from communicating with the child if he wanted to do so in the future.

Following the presentation of this evidence, the juvenile court orally adjudicated the child dependent and proceeded to the dispositional phase of the dependency proceeding. The maternal uncle testified during the dispositional phase that the mother had been concerned that the putative father would attempt to obtain custody of the child and that the mother had informed him that the putative father had hit her. He further stated that the mother had recounted an incident during which the mother had left the child in the putative father's care. According to the maternal uncle, the putative father had told the mother upon her return that he "could not handle" the child. The maternal uncle testified that it was the mother's intent to attempt to permanently relocate the child to the United States because of the putative father's behavior. He opined that the putative father suffers from some form of post-traumatic stress disorder caused by his upbringing during a civil war in Bosnia. The maternal uncle stated that the putative father had engaged in

threatening and harassing communication with the maternal relatives regarding the child and that the putative father's mother had agreed that it would be in "[the putative father's] best interest" for the child to remain in the United States. The maternal uncle testified that he and the maternal aunt were willing to undertake the rearing of the child.

On December 9, 2025, the juvenile court entered a factually detailed judgment finding that the child was "dependent as the mother died on March 31, 2025, leaving the child with no parent willing and/or able to care for [the child]." The juvenile court found that the putative father was not a presumed father pursuant to Ala. Code 1975, § 26-17-204, and noted that it believed that the putative father had attempted to marry the mother, despite knowing that he was still married to D.T., and, thus, had not attempted to marry the mother "in apparent compliance with [the] law." Based on that finding, the juvenile court explained that the putative father's "illegal actions" prevented him from succeeding in his presumptive-paternity argument. The juvenile court further noted that, pursuant to § 26-17-204(5), the putative father similarly failed to establish a presumption of paternity because there was no "concrete evidence" indicating that the putative father had openly held the child

out as his own or had established a significant relationship with the child.

Specifically, the juvenile court found

"[t]hat there was no testimony offered by the [putative] father or any witnesses of the [putative] father. The only testimony offered [at trial] was [from] the maternal uncle/petitioner, who testified that the mother and [the] child did go back and forth occasionally to visit [the putative father]. There was no concrete testimony or proof offered that suggested that [the putative father] received the child into his home on these visits and openly held the child out to be his own. There was no proof that [the] child has ever been to his home. There was no proof that [he] established a significant parental relationship with the child. There was no proof that [the putative father] had ever supported [the] child emotionally or financially before the death of the mother. There is undisputed proof that at least since the mother's death in March 2025 that [the putative father] has provided absolutely no emotional or financial support for the child. The only proof of any attempt to have a relationship with the child since the death of the mother is the attempts made by [the putative father] to have some telephone contact with the child but that the last of those attempts ha[d] turned into a dispute with the maternal uncle about this case."

Based on those findings, the juvenile court determined that the putative father was not the "presumed/legal father" of the child. Having found the child dependent because she was "without a parent to care for" her, the juvenile court awarded custody of the child to the maternal custodians.

On December 23, 2025, the putative father filed a postjudgment motion directed to the December 9, 2025, judgment. In that motion, the

11

putative father again argued that he was the presumptive father of the child pursuant to § 26-17-204. The juvenile court denied the putative father's motion without holding a hearing. The putative father appeals.

The putative father's arguments on appeal solely concern whether the juvenile court erred in determining that he was not the child's presumed father pursuant to § 26-17-204(a). That Code section provides, in relevant part:

"A man is presumed to be the father of a child if:

"(1) he and the mother of the child are married to each other and the child is born during the marriage;

"....

"(3) before the birth of the child, he and the mother of the child married each other in apparent compliance with law, even if the attempted marriage is or could be declared invalid, and the child is born during the invalid marriage or within 300 days after its termination by death, annulment, declaration of invalidity, or divorce;

"....

"(5) while the child is under the age of majority, he receives the child into his home and openly holds out the child as his natural child or otherwise openly holds out the child as his natural child and establishes a significant parental

12

> relationship with the child by providing emotional
> and financial support for the child...."

As a preliminary matter, we note that the putative father contests the juvenile court's jurisdiction to declare his marriage to the mother void. We note that, contrary to the putative father's assertions in his brief, the juvenile court did not declare the putative father's marriage to the mother void. In fact, the juvenile court itself readily acknowledged its lack of jurisdiction to void the marriage in its December 9, 2025, judgment. However, in order to determine whether the child was dependent, the juvenile court was required to determine whether the putative father was the child's legal father. To that end, the juvenile court necessarily had to examine the validity of the putative father's marriage to the mother to determine (1) whether the putative father was, in fact, married to the mother when the child was born and (2) if he was not, whether the putative father's marriage to the mother was "in apparent compliance with law even if the attempted marriage [was] or

13

could be declared invalid, and the child [was] born during the invalid marriage."[7]

The putative father next argues that the juvenile court erred in determining that he was not the presumed father of the child. He contends that the evidence supports a conclusion that he is the presumed father of the child either because the child was born during his marriage to the mother or his attempt to marry the mother in apparent compliance with law or because he had held the child out as his natural child and had received the child into his home. § 26-17-204(a)(1), (3), and (5).

> "This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id. We review the legal conclusions to be drawn from the evidence without a presumption of correctness. J.W. v. C.B., 68 So. 3d 878, 879 (Ala. Civ. App. 2011)."

---

[7]We also note that the juvenile court had jurisdiction over the initial dependency action and the contemporaneous issue of the putative father's paternity of the child. See Ala. Code 1975, § 12-15-115(a)(1)(6) (providing that the original jurisdiction of juvenile courts includes dependency actions and "[p]roceedings to establish parentage of a child pursuant to the Alabama Uniform Parentage Act, Chapter 17 of Title 26").

K.S.B. v. M.C.B., 219 So. 3d 650, 653 (Ala. Civ. App. 2016).

We begin by observing that the putative father's argument, as it was presented in his pleadings before the juvenile court, is that he was married to the mother when the child was born and that, even if the juvenile court determined that the marriage could have been voided, he and the mother had attempted to marry in apparent compliance with the law. Thus, although the juvenile court was without jurisdiction to void the putative father's marriage to the mother, as it acknowledged in its December 9, 2025, judgment, it necessarily had to determine whether the putative father's marriage to the mother was a valid marriage, thus satisfying § 26-17-204(a)(1), or whether the marriage could be void but had been entered into in "apparent compliance with law," which would satisfy § 26-17-204(a)(3). At the trial, the putative father's counsel appears to have conceded that the maternal custodians had presented sufficient evidence that the putative father's marriage to the mother was invalid. Thus, the putative father cannot now argue that he had entered into a valid marriage with the mother at the time of the child's birth. Morris Concrete, Inc. v. Warrick, 868 So. 2d 429 (Ala. Civ. App. 2003) (finding that a concession by trial counsel that testimony at trial,

15

if believed, could support a count of negligence and could not then be argued as a ground of reversal on appeal); see also Atkins v. Lee, 603 So. 2d 937, 945 (Ala. 1992) ("A party may not predicate an argument for reversal on 'invited error,' that is, 'error into which he has led or lulled the trial court'" (quoting Dixie Highway Express, Inc. v. Southern Ry., 286 Ala. 646, 651, 244 So. 2d 591, 595 (1971), and citing State Farm Mut. Auto. Ins. Co. v. Humphres, 293 Ala. 413, 418, 304 So. 2d 573, 577 (1974))). Even had the putative father not conceded that issue, it appears that the juvenile court correctly found that it was undisputed that the putative father married the mother before the entry of the Arizona divorce judgment. Alabama law does not permit bigamy.[8] See Ala. Code 1975, § 13A-13-1 ("A person commits bigamy when he intentionally contracts or purports to contract a marriage with another person when he has a living spouse."); see also Callaway v. Callaway, 739 So. 2d 1134 (Ala. Civ. App. 1999). Thus, the juvenile court properly found that there was sufficient evidence to determine that the putative father's marriage

---

[8]Section 26-17-103(b), Ala. Code 1975, provides that Alabama courts are to apply Alabama law in adjudicating the parent-child relationship.

16

to the mother could be voided by a court with the jurisdiction to do so and that § 26-17-204(a)(3), and not § 26-17-204(a)(1), was applicable to the present case.

Contrary to the maternal custodians' and the guardian ad litem's arguments on appeal, the fact that the purported marriage between the putative father and the mother could have been voided does not preclude the putative father from being the child's presumed father. We next consider whether the putative father's marriage to the mother, although possibly invalid, was made "in apparent compliance with law." § 26-17-204(a)(3). Neither this court nor our supreme court has interpreted that particular provision of § 26-17-204(a)(3). The putative father directs this court to In re Adoption of C.C., 491 P.3d 859 (Utah 2021), a case in which the Utah Supreme Court interpreted former Utah Code § 78B-15-204(1)(c), now § 81-5-204(1)(c), which is essentially identical to § 26-17-204(a)(3).

In In re Adoption of C.C., J.S.P. attempted to marry K.C. in New Hampshire in 2013 and, as part of that marriage, received a marriage license, participated in a marriage ceremony, and received "a certificate evidencing the 'fact of the[ir] marriage.'" Id. at 861. However, K.C. was

married to another man at the time of her attempted marriage to J.S.P., and, thus, her marriage to J.S.P. was bigamous, and "invalid <u>ab initio</u> -- 'absolutely void without any legal process.'" <u>Id.</u> at 865. K.C. separated from J.S.P. in late 2016 and gave birth to C.C., J.S.P.'s biological daughter, in Utah in August 2017. Two days after C.C.'s birth, K.C. signed a relinquishment of her parental rights and consent for C.C.'s adoption by prospective adoptive parents. K.C. attested in her relinquishment and consent that she was unmarried, a statement made in apparent recognition that her marriage to J.S.P. was invalid, but that J.S.P. was the potential father of C.C.

Utah adoption law, like that of Alabama, requires the consent of the presumed father of a child for a valid adoption. <u>See</u> Utah Code § 81-13-212(1)(b); Ala. Code 1975, § 26-10E-7(a). The trial court in <u>In re Adoption of C.C.</u> found that J.S.P. was not C.C.'s presumed father. The Utah Supreme Court concluded that the trial court's finding was erroneous, explaining that

> "[a] presumed father's statutory status cannot be defeated by a determination that the marriage was invalid or void at the outset. That is clear from the plain language of the statute, which provides that presumed fatherhood arises from an 'attempted marriage' in 'apparent compliance with law' --

18

'even if' such 'attempted marriage is or could be declared invalid.'"

<u>Id.</u> at 865 (quoting former Utah Code § 78B-15-204(1)(c)).

The Utah Supreme Court held in <u>In re Adoption of C.C.</u> that the 2013 marriage between J.S.P. and K.C. was entered into "in apparent compliance with law," interpreting that phrase as follows:

> "Perhaps there is ambiguity in some of the statutory words when read in isolation. Sometimes <u>apparent</u> means 'obvious' or 'manifest.' ... And in that sense, the 2013 marriage was not in 'apparent compliance with law.' But we do not interpret statutory words in isolation. We read them in context. ... And here the context forecloses the 'obvious' or 'manifest' sense of <u>apparent</u>. The statute is using apparent in the alternative sense of 'ostensible' or 'seeming.' ... That is clear from the above-noted fact that a presumed father's statutory status arises from an 'attempted marriage' even if it 'is or could be declared invalid.'
>
> "An attempted marriage is thus in 'apparent compliance' with the law where it is entered into in ostensible or seeming compliance with the law. That requirement is met where the would-be spouses apply for and receive a marriage license and procure an official certificate of marriage."

<u>Id.</u> at 865. In addition, the Utah Supreme Court rejected "as incompatible with the governing statute" the argument that J.S.P. was not C.C.'s presumed father because "at least one (if not both) of the parties to the 2013 attempted marriage knew that it was not in 'apparent

19

compliance' with the law," noting that, although some "related provisions of law … prescribe a requirement of knowledge or good faith belief of a spouse," former § 78B-15-204(1)(c) contained no such requirement, and it declined to "graft one onto it." Id. at 866.

Although we are not bound by Utah's interpretation of its former § 78B-15-204(1)(c), now § 81-5-204(1)(c), we note that the Utah statute and Alabama's § 26-17-204(a)(3) are part of each state's respective versions of the Uniform Parentage Act ("the UPA").[9] We are cognizant that, "[i]n applying and construing [the UPA], consideration must be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it." Ala. Code 1975, § 26-17-901. Our review of the caselaw of those states that have adopted the UPA reveals only one other case -- Steven N. v. Priscilla C., 119 Cal. App. 5th 639, 342 Cal. Rptr. 3d 796 (2026), review filed (May 5, 2026) -- that has meaningfully considered the phrase "in apparent compliance with law" as used in the UPA. In Steven N., the California Court of Appeal largely adopted the

---

[9]Alabama's UPA is codified at Ala. Code 1975, § 26-17-101 et seq.; Utah's UPA is codified at Utah Code § 81-5-101 et seq.

reasoning of the Utah Supreme Court in <u>In re Adoption of C.C.</u> and held

that a

> "'presumed parent and the child's natural mother have attempted to marry each other by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid,' under [Cal. Fam. Code §] 7611, subdivision (b)[, California's analog to Alabama's § 26-17-204(a)(3),] where they have applied for and received a marriage license and procured an official certificate of marriage."

119 Cal. App. 5th at 664, 342 Cal. Rptr. 3d at 815.

We find the Utah Supreme Court's analysis in <u>In re Adoption of</u>

<u>C.C.</u> to be persuasive. The maternal custodians urge this court to apply

a version of the "clean-hands doctrine" to this case and determine that

the putative father's knowledge that he was still married to D.T. when

he attempted to marry the mother should prevent the putative father

from claiming that he married the mother in apparent compliance with

the law. However, nothing in § 26-17-204(a)(3) imposes a knowledge or

good-faith requirement on either party to the attempted marriage, and

we decline to create such a requirement in the absence of legislative

direction. Moreover, the maternal custodians do not direct this court to

authority to support their argument that we should apply the clean-

21

hands doctrine to the phrase "in apparent compliance with law" contained in § 26-17-204(a)(3), and our research has not revealed such authority. Accordingly, we conclude that "[a]n attempted marriage is thus in 'apparent compliance' with the law where it is entered into in ostensible or seeming compliance with the law. That requirement is met where the would-be spouses apply for and receive a marriage license and procure an official certificate of marriage." In re Adoption of C.C., 491 P.3d at 865.

The record is silent as to whether the putative father and the mother applied for a marriage license in the country of Georgia. In fact, the record is silent as to whether the putative father and the mother even had to acquire such a license in the country of Georgia, and Alabama courts cannot take judicial notice of the laws of other jurisdictions. See Constantine v. Constantine, 261 Ala. 40, 42, 72 So. 2d 831, 832 (1954). However, it is clear that the putative father and the mother received an authorized marriage certificate that was issued by the appropriate authority in the country of Georgia. That document appears in the record, and the maternal custodians do not question its validity. Thus, we conclude that the putative father and the mother were married "in

apparent compliance with law" and therefore that the juvenile court erred in finding that the putative father was not the child's presumed father pursuant to § 26-17-204(a)(3).[10]

We note that, even if the juvenile court's judgment was correct with respect to § 26-17-204(a)(3), we would still find error in its finding that the putative father had not openly held out the child as his own and had not received the child into his home. Initially, we note that the plain language of § 26-17-204(a)(5) clearly indicates that one may be a presumed father of a child if "he receives the child into his home and openly holds out the child as his natural child" or, in the alternative, "otherwise openly holds out the child as his natural child and establishes a significant parental relationship with the child by providing emotional and financial support for the child." The putative father asserts that he received the child into his home and that he openly held out the child as

---

[10]We note that our supreme court found that Alabama's former version of the UPA had the "obvious objectives" of "provid[ing] for the psychological stability and general welfare of the child and [affording] legitimacy to children whenever possible." Ex parte C.A.P., 683 So. 2d 1010, 1012 (Ala. 1996) (emphasis added). We believe that Alabama's current version of the UPA maintains the objective of affording legitimacy to children whenever possible. Our interpretation of § 26-17-204(a)(3) is in line with that objective.

his natural child. The maternal uncle stated that no other individual has claimed to be the child's father, and it appears that the mother believed that the putative father was the child's biological father. The maternal uncle's testimony indicates that the putative father had referred to the child as his daughter, and the record indicates that the child and the putative father have the same surname.[11] The record also indicates that the mother and the child resided with the putative father in the UAE between 16 and 18 months, although the mother and the child traveled back and forth to the United States for the mother's medical treatments. Also, according to the maternal uncle, the putative father consistently participated in videochats with the child until the mother's death. Thus, we conclude that the juvenile court's judgment determining that the putative father was not the child's presumed father pursuant to § 26-17-204(a)(5) is not supported by the evidence.

Having determined that the juvenile court erred in finding that the putative father was not the child's presumed father, we reverse the

---

[11]We also note that there does not appear to be any assertion by the maternal custodians that the putative father is not the child's biological father. However, neither side presented that argument before the juvenile court or before this court on appeal.

juvenile court's December 9, 2025, judgment insofar as it found that the putative father was not the child's presumed father. Because the juvenile court erroneously found that the putative father was not the child's presumed father, it did not make a finding of dependency with respect to the putative father. Accordingly, we remand the case to the juvenile court to determine whether the child is dependent as to the putative father.

REVERSED AND REMANDED WITH INSTRUCTIONS.

Moore, P.J., and Hanson, Fridy, and Bowden, JJ., concur.